UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:13-cr-00054 (MPS) |
| | : | |
| v. | : | |
| | : | |
| DOMINIQUE MACK, | : | |
| KERONN MILLER, | : | |
| | : | |
| Defendants. | : | November 24, 2014 |

_____

### RULING ON MOTION IN LIMINE TO EXCLUDE
### DEFENDANT'S PRIOR STATEMENT UNDER FED. R. EVID. 410

**I.     Introduction**

Keronn Miller, a defendant charged with murder in furtherance of a conspiracy to tamper with a witness, seeks to bar from his upcoming trial a statement he allegedly made shortly after his arrest that he "guarantee[d]" the Government would obtain convictions if he agreed to testify against others as a Government witness. Mr. Miller argues that he made the statement during "plea discussions" and that it is thus inadmissible under Rule 410 of the Federal Rules of Evidence. After hearing evidence of the circumstances surrounding the statement, the Court disagrees and finds that Mr. Miller made the statement before he had even decided whether or not to tell the Government everything he knew—a point in the conversation that preceded even the earliest stage of what might be considered "plea discussions" under Second Circuit precedent.

**II.    Background and Findings of Fact**

On November 7, 2012, the Government obtained a warrant to arrest Mr. Miller, issued upon a criminal complaint (ECF No. 1). The complaint alleged that Mr. Miller had participated in the December 21, 2010 shooting of Ian Francis, which ultimately led to his death, in violation of 18 U.S.C. § 1512(a) (witness tampering causing death) and 18 U.S.C. § 2 (aiding and abetting).

More specifically, the Government alleged that Mr. Miller agreed to help the codefendant in this case, Dominique Mack, kill Mr. Francis. According to the Government, Mr. Mack wanted to kill Mr. Francis because Mr. Francis was attempting to convince Mr. Mack (then a fugitive in another case) to agree to allow Mr. Francis's girlfriend, Breann Wynter, who was also facing charges, to disclose Mr. Mack's location to the Government and thereby receive more lenient treatment from the Government. Under the Government's theory, Mr. Miller was motivated to assist Mr. Mack because of a separate dispute he was having with Mr. Francis, in which Mr. Francis was pressuring Mr. Miller to return a gun that Mr. Francis had lent him. Acting on this motive, Mr. Miller allegedly led Mr. Francis to the site of the shooting knowing that Mr. Mack was waiting.

The Government arrested Mr. Miller and immediately interviewed him on November 7, 2012. During that interview, Mr. Miller allegedly stated that if he testified for the Government, he "guarantee[d]" there would be convictions. The Government seeks to introduce that statement against Mr. Miller at his trial, which is scheduled to begin on December 1, 2014. Mr. Miller has moved to exclude that statement on the ground that it was made during "plea discussions," which would make it inadmissible under Fed. R. Evid. 410.

On November 13, 2014, the Court held an evidentiary hearing on the circumstances surrounding the November 7, 2012 statement. Three witnesses testified at the hearing: Sergeant Reginald Early of the Major Crimes Division of the Hartford Police Department, Special Agent Ryan James of the FBI's Safe Streets Task Force, and Kawan Johnson, Mr. Miller's mother. The Court also considered the following exhibits, which were admitted at the hearing: an FBI *Miranda* waiver form, signed by Mr. Miller and witnessed by Sgt. Early and SA James prior to the interview on November 7, 2012; two different versions of an affidavit by Ms. Johnson describing

the phone call she received from Mr. Miller during the interview[1]; and an FBI Form 302 summarizing the November 7, 2012 interview with Mr. Miller, prepared by SA James the same day as the interview.[2] On the basis of this evidence, the Court makes the following findings of fact:

      After arresting Mr. Miller on the morning of November 7, 2012, SA James and Sgt. Early drove him to the Abraham Ribicoff Federal Building located at 450 Main Street in Hartford and parked in the garage beneath the building. Before exiting the vehicle, SA James read Mr. Miller his rights, showed him the FBI waiver-of-rights form, and, together with Sgt. Early, witnessed his signature on the form. The form states, in part, that Mr. Miller has the right to remain silent, that anything he says in response to questioning can be used against him in court, that he has the right to speak with a lawyer before the Government asks him questions, that he has the right to have a lawyer with him during questioning, that if he cannot afford a lawyer, one will be appointed for him, and that he if decides to answer questions without counsel present, he has the right to stop answering at any time.

      Mr. Miller signed the waiver form at 11:44 am and was then escorted to a conference room in the U.S. Attorney's Office, located on the third floor of the building. SA James testified that although the FBI and the U.S. Marshals also had offices in the building, they were not suitable for witness interviews and that he never used those offices for witness interviews. Mr. Miller, SA James, and Sgt. Early sat together at a table in the conference room. SA James explained to Mr.

---

[1] In the course of the hearing, it was discovered that the version originally entered into evidence by the Government was missing a portion of the text of the affidavit, likely due to a printing error. A complete version of the affidavit was then admitted. This error does not reflect on the witness's credibility.

[2] Defense counsel also offered during the hearing an affidavit of Mr. Miller and, although Mr. Miller did not testify, asked the Court to consider the affidavit. The Government objected, on the ground that Mr. Miller had chosen not to testify and thus that the statement was not subject to cross-examination, and also that the Court had earlier indicated, after a disagreement between counsel, that it would not decide the matter based on affidavits or stipulated facts. The Court recognizes that it was not bound by the rules of evidence at this type of preliminary hearing. Fed. R. Evid. 104(a). The Court has therefore considered Mr. Miller's affidavit, which is attached to one of his briefs (ECF No. 124-1), in arriving at this decision. The Court notes that the affidavit is largely consistent with the evidence at the hearing and does not change the Court's view that the statement at issue is admissible.

Miller the charge he was facing and the sentence it carried.[3] He also explained the differences in punishment in the federal and state systems and told Mr. Miller that in the federal system, "life means life," meaning that if Mr. Miller was convicted, he would not be released on parole. SA James further told Mr. Miller that a way to avoid a mandatory life sentence would be to cooperate with the Government by telling the agents what he knew about the shooting of Mr. Francis.

Thereafter, Mr. Miller answered SA James's and Sgt. Early's questions about the Ian Francis shooting. As recorded in the Form 302, Mr. Miller essentially told them that he merely witnessed the shooting, and that although he had heard about Mr. Francis's plan to have Mr. Mack, in essence, turn himself in and knew that Mr. Mack opposed the plan, his car ride with Mr. Francis on the night of the shooting was arranged because Mr. Miller needed to talk with Mr. Francis about one of Mr. Miller's "boys" who wanted to buy a gun from Mr. Francis.

It was apparent at the hearing and from the Form 302 that the Government believes that Mr. Miller knows more about the shooting than he acknowledged in the interview. Nonetheless, according to SA James, Mr. Miller's version of events on November 7, 2012 was similar to the one he gave law enforcement agents during two previous interviews: one at St. Francis Hospital in December 2010 after the shooting, and the other at a state correctional facility on November 15, 2011 at which Mr. Miller was then incarcerated for another matter. It is worth noting that AUSA Brian Leaming, whose participation in the November 7, 2012 interview forms part of the basis of Mr. Miller's motion to exclude his statement at that interview, also attended the interviews in December 2010 and November 2011. Mr. Miller does not seek to exclude any statements made during those two earlier interviews.

---

[3] It is unclear whether SA James told Mr. Miller at this point that the death penalty was an authorized punishment if he was found guilty of first-degree murder within the meaning of 18 U.S.C. § 1111(b). Both he and Ms. Johnson testified, however, that the prosecutor mentioned this later in the discussion. The Government has since declined to seek the death penalty in this case.

When Mr. Miller reached the end of his narrative about the shooting of Mr. Francis, SA James left the room to speak with AUSA Leaming. SA James estimated that thirty to forty-five minutes had elapsed before he stepped out of the room to speak to AUSA Leaming; Sgt. Early's estimate of the same time frame was shorter—about twenty minutes. Sgt. Early, who remained in the conference room with Mr. Miller, asked him if he wanted something to eat or drink. According to the Form 302, Mr. Miller declined, responding, "this business is too important to eat."

After a few minutes, SA James returned to the conference room with AUSA Leaming. AUSA Leaming explained to Mr. Miller the charge he was facing and the punishment it carried. He repeated SA James's explanation of the differences between federal and state sentencing. He also told Mr. Miller that the Government knew that he was not the shooter and that other people were involved in the killing of Mr. Francis, but that Mr. Miller was the first person whom the Government had charged (by way of a criminal complaint) for the crime. He told Mr. Miller that if he cooperated with the Government by telling what he knew about the shooting, the Government would inform the sentencing judge of his cooperation and that the judge would then be authorized to impose something less than a life sentence. AUSA Leaming also told Mr. Miller about a federal homicide prosecution in Bridgeport in which a defendant had avoided a life sentence by cooperating against his codefendants. During this discussion, Mr. Miller asked what sentence he might expect, asking whether, for example, it would be five years or ten years. AUSA Leaming responded that the judge, not the Government, would determine Mr. Miller's sentence, and that the Government could not guarantee a particular sentence. This portion of the meeting likely lasted between forty-five minutes and an hour, although, according to Sgt. Early, AUSA Leaming

was "in and out" of the room during this portion of the meeting and may not have been present for the entire period.[4]

At 1:42 pm, Mr. Miller was allowed to telephone his girlfriend on a phone in the conference room. This call, which was made with the phone in "speaker mode," was brief and consisted of Mr. Miller's telling his girlfriend that he had been arrested. At 1:51 pm, Mr. Miller was allowed to telephone his mother, Kawan Johnson, using the same phone, which was initially placed in speaker mode. During this call, AUSA Leaming explained to Ms. Johnson that Mr. Miller was going to be charged with the murder of Ian Francis, that he would be facing a life sentence or the death penalty, and that he could avoid such a sentence if he provided truthful, helpful information to the Government about the shooting. Although there is some dispute about the exact words AUSA Leaming used, I find that he made clear during the call that the Government was seeking Mr. Miller's cooperation—that is, his providing truthful information about anything he knew about the shooting of Mr. Francis—and that cooperating would likely benefit Mr. Miller by leading potentially to a lesser charge or a lesser sentence by way of a recommendation to the sentencing judge.

After a few minutes, Ms. Johnson asked to speak to her son privately, and the phone was taken out of speaker mode. Sgt. Early testified that AUSA Leaming left the room at that point, and I credit his testimony in this respect. While Mr. Miller spoke on the telephone with his mother, SA James and Sgt. Early remained in the room; they could hear only his side of the conversation. At one point during this portion of the call, Mr. Miller made the following statement or something

---

[4] SA James testified that this portion lasted for "forty-five minutes or less"; but the Form 302, together with the waiver of rights form, suggests that it was a bit longer. The waiver of rights form indicates that it was signed at 11:44 am. Allowing fifteen to twenty minutes to escort Mr. Miller from the garage in which the form was signed to the U.S. Attorney's Office, and to begin the interview, I estimate that the interview began shortly after noon. Adding the twenty to forty-five minutes provided as estimates for the first portion of the interview involving only Mr. Miller, SA James, and Sgt. Early, and the "two to five minutes" during which SA James said he stepped out to retrieve Mr. Leaming, I estimate that the portion of the interview with Mr. Leaming began no later than about 12:50 to 12:55 pm. The Form 302 indicates that Mr. Miller telephoned from the conference room his girlfriend at 1:42 pm and his mother at 1:51 pm.

close to it: "If I testify, I guarantee they'll get convictions." Then there was a short pause, and Mr. Miller stated, "but they can't guarantee." Both Sgt. Early and SA James testified that when Mr. Miller made this statement, he appeared to be answering a question posed by his mother, although they could not hear her end of the conversation. SA James testified that he made eye contact with Sgt. Early when he heard the statement because he thought it was significant. Later in the same call, Mr. Miller stated that he was not going to speak until he had an attorney, someone he could "trust."

After the call with his mother ended, Mr. Miller remained in the room with SA James and Sgt. Early, and no one spoke. During the silence, Mr. Miller placed his head in his hands, and SA James thought he was on the verge of deciding what to do. SA James left the room to retrieve AUSA Leaming; he testified that he did so because he thought Mr. Miller "was about to talk" and he wanted AUSA Leaming to hear what Mr. Miller would say. AUSA Leaming returned to the conference room, but there was no further conversation. Mr. Miller did not speak further with the Government, and was presented before a United States Magistrate Judge later that afternoon.

**III.    Legal Standard**

Fed. R. Evid. 410(a)(4) prohibits admitting evidence of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." "Whether a party is engaged in plea discussions is a factual question that must be determined on a case-by-case basis." *United States v. Serna*, 799 F.2d 842, 848 (2d Cir. 1986).

"The underlying purpose of Rule 410 is to promote plea negotiations by permitting defendants to talk to prosecutors without sacrificing their ability to defend themselves if no disposition agreement is reached." *United States v. Barrow*, 400 F.3d 109, 116 (2d Cir. 2005). The Second Circuit has held that proffer discussions fall within the protection of the Rule, *id.*, and that

7

requiring formal plea negotiations before a defendant could invoke the Rule would contravene its purpose, *Serna*, 799 F.2d at 849. But "[b]ecause Rule 410 is an exception to the general principle that all relevant evidence is admissible at trial, its limitations are not to be read broadly." *Barrow*, 400 F.3d at 116 (internal citation and quotation marks omitted). "[T]he purpose [of the rule] can best be served if the accused is required, at least, to make manifest his intention to seek a plea bargain before he takes the route of self-incrimination." *United States v. Levy*, 578 F.2d 896, 901 (2d Cir. 1978).

Although the Rule refers to "plea discussions with an attorney for the prosecuting authority," the prosecutor need not be present for the discussions to be protected. "[T]he rule can be fairly read to require the *participation* of a Government attorney in the plea discussions, but not necessarily his physical *presence* when a particular statement is made to agents whom the attorney has authorized to engage in plea discussions." *Serna*, 799 F.2d at 849.

**IV.   Discussion**

As a initial matter, the Court considers the allocation of the burden of proof to show that Rule 410(a)(4) applies, i.e., that the statement was made during plea discussions. The Court finds that Mr. Miller bears that burden—although placing the burden on the Government would not, in the case at bar, lead to a different outcome. Precedents within the Second Circuit establish that the defendant bears the burden. *United States v. Gomez*, 705 F.3d 68, 78 (2d Cir. 2013) ("Gomez has not carried his burden of showing that his telephone conversation came within Rule 410."); *United States v. Gallo*, No. 3:99CR111 AWT, 2000 WL 852453, at *9 (D. Conn. Apr. 13, 2000) ("The defendant has failed to establish that his statements occurred during plea discussions.").[5] Given that Rule 410's protection of plea discussions is effectively a privilege, *see United States v.*

---

[5] The Fifth Circuit seems to have reached a different conclusion. *United States v. Robertson*, 582 F.2d 1356, 1366 n.21 (5th Cir. 1978) ("[T]he government apparently bears the burden of proving that the discussion was not a plea negotiation once the issue has been properly raised.").

*Mezzanatto,* 513 U.S. 196, 205 (1995), placing the Rule 410 burden on Mr. Miller is consistent with the general rule that a party claiming the protection of a privilege bears the burden of proving the elements of the privilege, *see von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

Based on all the evidence presented during the evidentiary hearing, it is clear both that the Government was seeking Mr. Miller's cooperation and that Mr. Miller never reached the point of agreeing to tell the Government everything he knew about the shooting—that is, agreeing to make a proffer. While he appeared at one point to be on the verge of doing so, he stopped short, either due to the Government's failure to "guarantee" him a particular sentence or because he wanted to speak to an attorney first or for some other reason. Although Mr. Miller may well have been considering whether to proffer, and the Government had made it known that it would be interested in his information, there was no outward manifestation that Mr. Miller had actually made a decision to proffer. Nor had the Government given Mr. Miller any reason to believe that a proffer session was already underway, for example, by telling him that his statements would not be used against him—indeed, the *Miranda* waiver signed immediately before the interview said exactly the opposite.

This case, then, involves a stage of discussions that is anterior even to the proffer stage, which several courts, including the Second Circuit, have treated as the first step in "plea discussions" and thus protected under Rule 410. *See, e.g.*, *Barrow*, 400 F.3d at 116 ("Statements made by defendants in proffer sessions are covered by Rule 410."); *United States v. Riedman*, No. 11-CR-6083CJS, 2014 WL 713552, at *23 (W.D.N.Y. Feb. 18, 2014) ("Proffer sessions, which are often the first steps in a plea negotiation process, are generally protected by Rule 410."); *United States v. Stein*, No. CR. 04-269-9, 2005 WL 1377851, at *10 (E.D. Pa. June 8, 2005) (applying Rule 410 to proffer sessions because "[i]n practice, the process of negotiating a plea

often begins, not with a discussion of the terms of the plea, but with a proffer session" and "[t]he very nature of a proffer session requires a defendant to make self-incriminating statements by detailing his involvement").

To stretch the protective blanket of Rule 410 further back in time to cover the stage at which an arrestee is still obtaining information from the Government in deciding whether he will, in fact, proffer would be an unwarranted expansion of the holding in *Serna*, which dealt with a scenario that was, in substance, a proffer session. *See* 799 F.2d at 848-49 ("The AUSA indicated that statements made by Serna would not be used against him . . . . [T]he agents were acting under the AUSA's authority . . . ."). Such an expansion would effectively immunize all but the briefest encounters between arrestees and law enforcement officials. It would also risk turning virtually any meeting between a prosecutor and an arrestee into a plea discussion, as such meetings will frequently involve the prosecutor touching on topics that might be relevant to the defendant's decision whether to make a proffer (the legal process, charges, sentencing, and the like). The Court therefore finds that plea discussions were not underway merely because the Government was providing information about why Mr. Miller would benefit from proffering.

Nor can Mr. Miller's statement itself ("If I testify, I guarantee they'll get convictions. . . . But they can't guarantee.") be construed as a form of negotiation. Mr. Miller has argued that the statement may fairly be interpreted as an attempt to induce the Government to offer a deal with a fixed sentence, per Fed. R. Crim. P. 11(c)(1)(C). But both agents testified that Mr. Miller made the statement to his mother, not to them, apparently in response to a question by her. There is no evidence that AUSA Leaming had conferred authority on the agents to negotiate the Government's position, and he was not in the room when the statement was made, all of which tends to confirm the agents' testimony that the statement was directed solely at Mr. Miller's mother.

While the absence of a prosecutor when a statement is made is not dispositive on the question of the statement's admissibility, *see Serna*, 799 F.2d at 848, it is obviously relevant, as is clear from the language of the Rule 410(a)(4) ("a statement made during plea discussions with an attorney for the prosecuting authority"). Here, the absence of AUSA Leaming from the room when Mr. Miller made the statement at issue is significant because it makes it less likely that the statement was intended as a negotiating tactic. Although the language of the Rule does not require that the statement be directed at the prosecutor, the circumstances here suggest that the statement at issue was not directed at the Government at all and was neither part of a negotiation nor part of an attempt to induce a negotiation; rather, it was a response to a question from a person not in the room.

Under these circumstances, I find that Mr. Miller's statement was not "made during plea discussions with an attorney for the prosecuting authority." Fed. R. Evid. 410(a)(4). Rule 410 therefore does not bar its admission.

**Conclusion**

For the foregoing reasons, the Court DENIES Defendant Keronn Miller's motion in limine to exclude the November 7, 2012 statement at issue (ECF No. 91).

**SO ORDERED** this 24th day of November, 2014, at Hartford, Connecticut.

                                                     /s/
                                                Michael P. Shea
                                                United States District Judge